**In re DOWNINGTOWN INDUSTRIAL & AGRICULTURAL SCHOOL, Debtor.**

**DOWNINGTOWN INDUSTRIAL & AGRICULTURAL SCHOOL, Plaintiff,**

v.

**COMMONWEALTH OF PA. DEPT. OF EDUCATION, Commonwealth of Pa. Dept. of General Services, the General State Authority, Defendants.**

Bankruptcy No. 94–11370DAS.
Adv. No. 94–0616DAS.

United States Bankruptcy Court,
E.D. Pennsylvania.

Oct. 10, 1994.

David A. Searles, Philadelphia, PA, for debtor.

Barry D. Kleban, Adelman Lavine Gold & Levin, Philadelphia, PA, for Com. Dept. of Educ. and Com. of Pennsylvania Dept. of General Services.

Michael Jon Daley, David L. Janetta, General Counsel, Harrisburg, PA.

Pace Reich, Clark, Ladner, Fortenbaugh & Young, Philadelphia, PA, for Creditors' Committee.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

Presently before this court in the above-captioned adversary proceeding ("the Proceeding"), instituted by DOWNINGTOWN INDUSTRIAL & AGRICULTURAL SCHOOL ("the Debtor") in the course of its Chapter 11 bankruptcy case, are two separate identical motions to dismiss the Proceeding ("the Motions"), one filed jointly by Defendant COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF EDUCATION ("the DOE") and Defendant COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF GENERAL SERVICES ("the DGS"), and the other filed by THE GENERAL STATE AUTHORITY ("the GSA," together with the DOE and the DGS, "the Defendants"). The Motions raise principally the issues of sovereign immunity, limitations, and the statute of frauds. We find that the Defendants' potential sovereign immunity is waived by the filing of proofs of claim by other agencies of the Commonwealth of Pennsylvania ("PA"). We find that limitations is not a serious impediment to the Debtor, because its cause of action accrued less than one year before the Proceeding was filed. Finally, the lease contracts in issue constitute at least sufficient memoranda to satisfy the statute of frauds, even though they were not, as was proper, executed by the Governor of Pennsylvania ("the Governor"). Thus, we deny the Motions.

### B. PROCEDURAL AND FACTUAL HISTORY[1]

The Debtor was founded in 1905. Its mission was to teach African–Americans farm-

---

1. Because, when deciding a motion to dismiss, we must take as true all well pleaded facts of the party defending the motion, the following fact recitation is taken from the Debtor's adversary complaint ("the Complaint").

ing and related skills. As enrollment in the Debtor increased, it subsequently expanded its educational mission to include academic, as well as vocational, training. The Debtor is located on a 110–acre plot of land just outside of Downingtown, Chester County, Pennsylvania.

The original school buildings, which were erected by the students themselves, began to deteriorate over time. At some unspecified time in the 1960's, the Debtor decided to renovate and improve its facilities, and approached PA for financing. At that time, the GSA was authorized to construct projects for the benefit of agricultural and industrial schools. Apparently, negotiations between the Debtor, the GSA, and other PA agencies spanned several years. Upon the conclusion of the negotiations, the Debtor entered into a transaction with both the GSA and the DOE in the late 1960's by which it financed the construction of classrooms, a gymnasium, a dining hall, and a kitchen ("the Project"). The Project, which was to be constructed in two portions, was financed by a bond issue sponsored by the GSA ("the Bonds"). Both portions of the Project were completed around 1967.

The transaction produced the following relevant written instruments: (1) a properly-executed deed dated November 27, 1967, by which the Debtor conveyed the two interior tracts of land upon which the Project was constructed ("the Property") to the GSA for the nominal consideration of $1.00; (2) a properly executed "Lease of Partially Completed Project" dated May 15, 1968, from the GSA to the Department of Public Instruction (the DOE's predecessor) concerning one portion of the Project ("Lease One"); (3) a nearly identical, properly-executed lease between the same parties concerning the re-

maining portion of the Project ("Lease Two," and, with Lease One, "the Leases"); (4) an undated, partially-executed "Sublease of Partially Completed Project" from the DOE to the Debtor concerning the first portion of the Project ("Sublease One"); and (5) a nearly identical, undated, partially-executed[2] sublease between the same parties concerning the second portion of the Project ("Sublease Two," and, with Sublease One, "the Subleases"). The Subleases were signed by the DOE and the Debtor, but not by the Governor of Pennsylvania, who had the exclusive right to approve the Subleases.

Although the operative documents are titled "Leases" and "Subleases," the Debtor asserts that the transaction was actually a disguised, secured financing which was structured as sales and leasebacks to meet the Debtor's obligations under the Bond issue. The "rents" due under the Subleases, which the Debtor asserts were recouped by PA directly from appropriations designated for the Debtor, presumably were used to pay those sums due under the Bonds, thereby indirectly reimbursing PA for the cost of the Project.

The Debtor asserts that it was never the intention of the parties that any state agency should take permanent fee simple title to the Property for one dollar.[3] Rather, the Debtor claims that title to the Property was to revest in the Debtor once it met its obligation under the Bonds. The Debtor points to the following substantially identical "option" clauses contained in both Leases as evidence of this intended defeasance:

> The parties to this lease agree that [the Debtor] to which the leased premises are to be subleased by the Commonwealth shall have the option beginning September 17, 1995,[4] to purchase the leased premises

2. Although all parties acknowledge that Sublease Two, like Sublease One, was partially executed, the copy of Sublease Two appended to the Complaint is unexecuted. Given the parties' assertions, we assume that an unexecuted copy of Sublease Two was inadvertently used as an exhibit, and that a partially-executed version of the document exists.

3. The GSA subsequently transferred title to the Property, and a good many more, to the DGS on June 16, 1989. This subsequent mass transfer was subject to all manner of rights of third parties, whether or not recorded.

4. The date of May 15, 1995, is substituted here in Lease Two.

upon paying to the Authority an amount of cash equal to the minimum amount required to be deposited with the Fiscal Agent under the Resolution of the Authority of June 27, 1949, as supplemented and amended, in order to permit such sale under the provisions of subdivision (c) of the section 8.14 of said Resolution.

We have not been provided with a copy of the June 27, 1949, resolution, but the Debtor alleges that the amount of money needed to exercise the options is now zero.

Quite apart from the transaction described above, the Debtor fell upon hard times and, sadly, was forced to close its doors at some undesignated date in 1992 or 1993. It thereafter filed a voluntary Chapter 11 bankruptcy in this court on March 14, 1994.

It is not inaccurate to observe that resolving the status of the Leases and Subleases of the Property has been, to date, by far the single most important issue arising in this case. When the Debtor's original counsel failed to act, the Official Creditors' Committee ("the Committee") formed in this case filed, on May 10, 1994, a motion to extend the Debtor's time to assume or reject the Subleases ("the Extension Motion") and thereby avoid the potentially devastating impact of their rejection, pursuant to 11 U.S.C. § 365(d)(4). *See, e.g., In re Morningstar Enterprises, Inc.,* 128 B.R. 102, 104–05 (Bankr.E.D.Pa.1991). The Extension Motion, which was actively opposed by the DOE, was joined by the Debtor, after it obtained new counsel, on or about June 1, 1994. New counsel also filed, on June 13, 1994, a motion seeking a declaration from this court that the Leases and Subleases were not "true" lease contracts ("the Declaration Motion").

The hearings on these two Motions were ultimately continued to September 28, 1994, by agreement of the parties, to allow discovery to be conducted. On August 1, 1994, the DOE moved to have Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 7012 deemed applicable to the Declaration Motion, arguing

that that Motion should have been filed as an adversary proceeding. On August 5, 1994, the DOE and the DGS filed a motion to compel the Debtor to imminently assume or reject the Subleases under 11 U.S.C. § 365(d)(2) or, in the alternative, for relief from the automatic stay to exercise their state-law rights thereunder ("the Relief Motion").

On August 19, 1994, we approved a Stipulation by which the Debtor agreed to refile the Declaration Motion in the form of the instant Proceeding. The parties agreed that they would attempt to negotiate a resolution of their differences but, in the event that they were unsuccessful, the trial of the Proceeding would be initially scheduled on November 2, 1994, and hearings on the Extension Motion and the Relief Motion would also be continued to that date. Ultimately, the trial of the Proceeding and the hearings on the above-referenced Motions were continued to November 16, 1994, on a must-be-tried basis. This court would be reluctant to allow any further continuances, because the Debtor is obliged to file its plan of reorganization and disclosure statement by December 30, 1994, which, as a date over nine months after the filing of the case, is unlikely to be set back. Prompt resolution of the Proceeding is therefore necessary to move this case forward.

The Debtor's Complaint in this Proceeding, which was filed on August 17, 1994, seeks a declaration from this court that the transactions described above are actually a secured financing transaction akin to a mortgage. The Complaint also prays that we either reform the lease transactions as a mortgage-backed secured transaction or order the Defendants to transfer the Property's title to the Debtor outright.

The GSA and the DOE filed their Motion to Dismiss on the stated ground that the Complaint fails to state claims upon which relief may be granted, pursuant to F.R.B.P. 7012(b), which incorporates Federal Rule of Civil Procedure ("F.R.Civ.P.") 12(b)(6). The

Motion also seeks dismissal of the Complaint on jurisdictional grounds, pursuant to F.R.B.P. 7012(b), which incorporates F.R.Civ.P. 12(b)(1), (2). Specifically, the Motion argues that the Plaintiff is barred from relief by principles of state and federal sovereign immunity, the applicable statute of limitations, and the statute of frauds. The Motion also argues that the DOE is not authorized by law to transfer title to real property, nor could it convey title to the Property, even if authorized, because it does not hold, and has never held, title to the Property.

By Order dated September 13, 1994, we directed the Debtor to file an Answer and Brief in opposition to the Motion, and for the Defendants to answer the Complaint by September 23, 1994. Although we received the Answer from the DOE and the DGS and the Debtor's Brief in opposition to the Motion in timely fashion, we were forced to delay submission of the Motion because we became aware, on September 21, 1994, that a separate, and nearly identical Motion to Dismiss had been filed by the GSA on September 16, 1994. We promptly entered a further Order of September 23, 1994, allowing the GSA until September 28, 1994, to answer the Complaint and allowing any further briefing on the GAS's Motion to Dismiss until September 28, 1994. We received no further briefing relative to the GSA's Motion, and, in light of the similarities between the two Motions to Dismiss, we shall consider and dispose of both Motions together herein.

## C. ARGUMENT

### 1. The Standard for Relief on a Motion to Dismiss

■ As we thusly noted in *In re Dinkins,* 79 B.R. 253, 257 (Bankr.E.D.Pa.1987), as well as in several other of our decisions, the burden placed upon the movant of a motion to dismiss is heavy:

[i]t is black-letter law that a motion to dismiss "is viewed with disfavor and is rarely granted" and that such relief is "to be granted only in the unusual case in which the plaintiff includes allegations that

show on the face of the complaint that there is some insuperable bar to relief." 5 C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE, § 1357, at 598, 604 (1969). Put otherwise, "the court should deny a motion to dismiss for failure to state a claim 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" 2A J. MOORE, FEDERAL PRACTICE, § 12.07[2.–5], at 12–65 (2d ed. 1987) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)).

*See also, e.g., In re Nutri/System, Inc.,* 1994 WL 96963, slip op. at *2–*3 (Bankr.E.D.Pa. March 23, 1994); and *In re TM Carlton House Partners, Ltd.,* 110 B.R. 185, 187 (Bankr.E.D.Pa.1990). *Accord, Galgay v. Gangloff,* 677 F.Supp. 295, 297 (M.D.Pa.1987) ("The material allegations of the complaint should be regarded as admitted, and the complaint should not be dismissed unless it appears that the plaintiffs can prove no set of facts in support of their claims which would entitle them to relief.").

■ We are not, however, required to presume as true conclusions which are not supported by the allegations of fact contained in the Complaint. 5A C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE, § 1357, at 315–18 (1990) ("[Courts] ... have said that they do not accept 'legal conclusions,' 'unsupported conclusions,' 'unwarranted inferences,' 'unwarranted deductions,' 'footless conclusions of law,' or 'sweeping legal conclusions cast in the form of factual allegations.'") (footnote omitted); and 2A J. MOORE, FEDERAL PRACTICE, § 12.07[2.–5], at 12–85 (2d ed. 1994) ("[L]egal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness.") (footnote omitted). For the following reasons, we conclude that Plaintiff's Complaint withstands the Motions to Dismiss.

### 2. Declaratory Relief Generally

■ The Complaint in issue seeks, primarily, declaratory relief regarding the legal sta-

tus of the Leases. Although the statutory predicate for the declaratory relief sought by the Plaintiff is not stated, it is quite clear that federal courts, including bankruptcy courts, may grant a party such relief under the authority of the Declaratory Judgment Act ("the DJA"), which provides, in relevant part, that "[i]n a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such a declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. When there is an actual controversy between the parties, the DJA allows a court to settle the parties' respective rights, even before there is a violation of law, exercise of right, or breach of duty. *See, e.g., Océ–Office Systems, Inc. v. Eastman Kodak Co.*, 805 F.Supp. 642, 646 (N.D.Ill.1992) ("Resolving the uncertainty and anxiety resulting from a looming lawsuit is, indeed, the purpose of the Declaratory Judgment Act."); *American Mail Line, Ltd. v. United States*, 213 F.Supp. 152, 160 (W.D.Wash.1962) ("[T]he Declaratory Judgment Act was enacted to permit parties to resolve their disputes before a cause of action has accrued...."). *See also* 22A AM. JUR.2d, 677, *Declaratory Judgments*, § 8 (1988) ("[A] prime purpose of declaratory judgment stat-

utes is to ... make a controversy over a legal or equitable right or title justiciable at an earlier state of the controversy than that which gives rise to a cause of action at common law."); and *id.*, at 721, § 63 ("[I]t has been held in a number of instances that a contract may be construed or its validity determined before a breach occurs.") (footnotes omitted).[5]

■ A declaratory judgment may well be appropriate in the context of a contract dispute even before an actual breach of the contract occurs. *See, e.g., Hardware Mutual Casualty Co. v. Schantz*, 178 F.2d 779, 780 (5th Cir.1949) ("The purpose of the Declaratory Judgment Act is to settle 'actual controversies' before they ripen into violations of law or a breach of some contractual duty."); *American Type Founders, Inc. v. Lanston Monotype Machine Co.*, 137 F.2d 728, 729 (3d Cir.1943) (court "entertain[ed] no doubt that an actual controversy exist[ed] within the purview of the Declaratory Judgment Act" where plaintiff sought declaration of right to cancel contract while defendant sought its enforcement); *Lehigh Coal & Navigation Co. v. Central R.R. N.J.*, 33 F.Supp. 362, 365 (E.D.Pa.1940) ("Construction and interpretation of written instruments ... is the principle function of a declaratory judgment proceeding.").[6]

---

**5.** Pennsylvania has its own declaratory judgment act which serves much the same purpose as the federal act, 42 Pa.C.S. §§ 7531–41. "[The Pennsylvania Declaratory Judgments Act] is declared to be remedial. Its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations, and is to be liberally construed and administered." 42 Pa.C.S. § 7541(a). *See Liddick v. Louden*, 52 Pa.D. & C. 402, 410–12 (Perry Co. C.P.1945) (declaratory relief under Pennsylvania's act is appropriate when there is a controversy or threatened controversy).

**6.** *See also* 22A AM.JUR.2d, *supra*, at 677, *Declaratory Judgments*, § 8 ("A major purpose of the Acts is the construction of definitely stated laws, rights, status, and other legal relations, commonly expressed in written instruments...."); *id.*, at 720, § 62 ("Under ... declaratory judgment acts, including the federal statute, which contains no specific provision referring to contract rights, declaratory judgments have ... been rendered with regard to questions arising under

contracts."); *id.*, ("Declaratory judgments are frequently rendered to interpret or construe contracts...."); *id.*, at 818, § 173 ("The validity and construction of mortgages and deeds of trust and the rights and liabilities connected therewith may be determined in declaratory judgment proceedings.") (footnotes omitted); 26 C.J.S. 147–48, *Declaratory Judgments*, § 53 (1956) ("The construction or validity of a written instrument may be a proper subject for a declaratory judgment, and the respective rights and liabilities of the parties thereunder may be adjudicated even though there be no actual controversy."); *id.*, at 148, § 54 ("[A]n action or proceeding for a declaratory judgment may be appropriate for the purpose of determining the construction, the effect or the result produced by a contract...."); *id.* at 158, § 58 ("A contract to convey realty may be the proper subject of a declaratory judgment; and the rights and obligations of the parties to such a contract may be adjudicated...."); *id.* at 174–75, § 70 ("[T]he adjudication of title, or of conflicting claims or doubtful questions relating to title, or of a right to, in, or with respect to

We have no doubt that there exists an actual controversy[7] between the parties to the Proceeding regarding the legal effect of the Leases and Subleases. Clearly, the Debtor and the Defendants disagree on the fundamental structure and function of the lease transactions, as well as their respective rights and obligations thereunder. Indeed, this disagreement may have already resulted in a breach of the parties' agreement, in that Debtor claims it is now entitled to the title to the Property, while the Defendants are obviously unwilling to relinquish it.

■ Our jurisdictional analysis must not end here, however. It is well established that the DJA is procedural, and is not an independent source of federal jurisdiction. *See, e.g., Terra Nova Ins. Co. v. 900 Bar, Inc.,* 887 F.2d 1213, 1218 n. 2 (3d Cir.1989) ("The [Declaratory Judgment] Act is not an independent basis of federal jurisdiction."); *Cutaiar v. Marshall,* 590 F.2d 523, 527 (3d Cir.1979) ("The [Declaratory Judgment Act] creates a remedy only; it does not create a basis of jurisdiction...."). We must, therefore, confirm our jurisdiction to hear this controversy.

■ Ordinarily, deciding whether an agreement between a debtor and one of its creditors is a true lease or a secured transaction is within the jurisdiction of the bankruptcy court. *See In re PCH Associates,* 60 B.R. 870, 872–73 (S.D.N.Y.), *aff'd,* 804 F.2d 193 (2d Cir.1986) (in a case cited by the Defendants, the court concluded that an ad-

versary proceeding seeking judicial determination of whether agreement was true lease or joint venture agreement was a "core" proceeding); and *In re Nite Lite Inns, Inc.,* 13 B.R. 900, 902–03, 914 (Bankr.S.D.Cal. 1981) (court exercises jurisdiction over complaint seeking declaratory relief on the true lease/disguised financing arrangement issue). However, the specific facts of this case, as well as the identity of the parties involved, make the determination of our jurisdiction in this instance much more difficult. The Defendants argue that state and federal sovereign immunity and the applicable statute of limitations prevent us from exercising jurisdiction over this particular matter. We must therefore carefully consider these arguments before proceeding. Because our determination of the sovereign immunity issue will dictate whether we need consider the state law issues underlying this matter, including the statute of limitations question, we will begin with the immunity issue first. *Compare Cassidy v. Adams,* 872 F.2d 729, 732 (6th Cir.1989) (court considers state law statute of limitation question first notwithstanding state's sovereign immunity defense because "resolution of the state law question is a prerequisite to resolution of the substantive federal and constitutional questions presented in this appeal.").

### 3. The Defendants Have Waived Their Potential Sovereign Immunity

■ According to the Eleventh Amendment to the Constitution, a state and its

[real] property ... is an appropriate subject of declaratory relief...."); and *id.* at 184, § 77 ("An action for a declaratory judgment is appropriate for the determination of the validity of a mortgage or trust deed, or the right, duties, powers or liabilities of the parties thereunder....") (footnotes omitted). *Cf.* 42 Pa.C.S. § 7533 ("Construction of documents"); and § 7534 ("Before breach of contract").

**7.** The Declaratory Judgment Act ... limits the jurisdiction of a federal court to declare the rights and other legal relations of interested parties to actual controversies. The standard to be employed in determining whether a case of actual controversy exists within the meaning of the Act is similar to that for determining whether the case or controversy requirement of the United

States Constitution has been satisfied.... In construing the Declaratory Judgment Act, the Supreme Court articulated the standard for determining an actual controversy as follows:

"Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."

*In re Busy Beaver Building Centers, Inc.,* 127 B.R. 343, 345 (Bankr.W.D.Pa.1991), quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941) (citations omitted).

agencies may not be sued by one of its citizens in federal court. U.S. CONST. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State....").[8] Over the years, this principle of constitutional sovereign immunity has been the subject of seemingly inconsistent opinions by the Supreme Court. Therefore, the exact confines of this immunity are not easy to define.

It is certain, however, that constitutional sovereign immunity is not as absolute as the language of the Amendment would suggest. For example, prospective declaratory or injunctive relief may be awarded to a party that has sued a state official in federal court and federal issues are implicated. *See Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). However, despite the Debtor's almost offhand treatment of this issue, which seems to assume that no immunity arises as to any suit for merely declaratory relief, whether even declaratory relief is available when only state law issues are involved, as is the case here, seems unlikely. *See Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104–06, 104 S.Ct. 900, 910–11, 79 L.Ed.2d 67 (1984). A majority of the Justices sitting on the Supreme Court have also held that Congress may abrogate the state's constitutional sovereign immunity if it does so in an unequivocal fashion within the body of an applicable statute. *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 242–43, 105 S.Ct. 3142, 3147–48, 87 L.Ed.2d 171 (1985). *See also* S. Richman, *More Equal Than Others: State Sovereign Immunity Under the Bankruptcy Code*, 21 RUTGERS L.J. 603, 626 (1990) (cited as "Richman"). It is also well established that a state can waive its constitutional sovereign immunity in the context of a particular controversy. *See, e.g., Edelman v. Jordan*, 415 U.S. 651, 673, 94 S.Ct. 1347, 1360–61, 39 L.Ed.2d 662 (1974).

Until fairly recently, sovereign immunity played a very limited role in bankruptcy proceedings due to the perceived Congressional abrogation of that immunity found in 11 U.S.C. § 106, which provides as follows:

(a) A governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which such governmental unit's claim arose.

(b) There shall be offset against an allowed claim or interest of a governmental unit any claim against such governmental unit that is property of the estate.

(c) Except as provided in subsections (a) and (b) of this section and notwithstanding any assertion of sovereign immunity—

(1) a provision of this title that contains "creditor", "entity", or "governmental unit" applies to governmental units; and

(2) a determination by the court of an issue arising under such a provision binds governmental units.

Subsection (c) of § 106 was generally interpreted by the bankruptcy and appellate courts as a sweeping abrogation of a state's constitutional sovereign immunity in the context of those Bankruptcy Code provisions containing the § 106(c)(1) "trigger words." *See generally In re Vazquez*, 788 F.2d 130, 132–33 (3d Cir.), *cert. denied*, 479 U.S. 936, 107 S.Ct. 414, 93 L.Ed.2d 365 (1986); and Richman, *supra*, 21 RUTGERS L. J. at 609–617, and other cases cited therein at 610 n. 31.

However, the Supreme Court, in *Hoffman v. Connecticut Department of Income Maintenance*, 492 U.S. 96, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989), did not read § 106 so broadly, and held that "[t]he language of § 106(c) is more indicative of declaratory and injunctive relief than of monetary recovery."

---

**8.** Although a literal reading of the Eleventh Amendment suggests that a suit by a citizen against its own state in federal court would not be prohibited, the Amendment has long been interpreted as applying to that situation as well. *See, e.g., Hans v. Louisiana*, 134 U.S. 1, 10–21, 10 S.Ct. 504, 505–09, 33 L.Ed. 842 (1890).

*Id.* at 102, 109 S.Ct. at 2823.[9] In light of this directive from the Supreme Court, we may not be able to decide the controversy before us unless (a) the relief sought by Debtor can fairly be characterized as declaratory or injunctive *and* arises under a Bankruptcy Code section containing one of the § 106(c)(1) "trigger words;" or (b) PA has waived its constitutional sovereign immunity.

The Defendants argue that the Debtor's Complaint raises issues of state law only, and not claims under a "trigger word" Code section. They also argue that the transfer of title sought by the Debtor goes beyond declaratory relief and constitutes a money recovery. At least the first of these arguments appears well-placed, and the Debtor does not rise to dispute either of them.

Nevertheless, we conclude, on the basis of several of our prior decisions in this area, that these assertions do not defeat our jurisdiction because the Defendants, as agencies of PA, have waived their constitutional sovereign immunity. As we have held in *In re St. Mary Hospital,* 125 B.R. 422, 425–26 (Bankr. E.D.Pa.1991); and *In re St. Joseph's Hospital,* 103 B.R. 643, 649–51 (Bankr.E.D.Pa. 1989), whenever an agent or agency of a state files a proof of claim in a debtor's bankruptcy case, that agent or agency has waived the state's sovereign immunity. *Accord, In re Cook United, Inc.,* 117 B.R. 301, 304–05 (Bankr.N.D.Ohio 1990). *But see WJM, Inc. v. Massachusetts Dep't of Public Welfare,* 840 F.2d 996, 1003–04 (1st Cir.1988); and *In re Four Seasons Care Centers, Inc.,* 119 B.R. 681, 683–84 (Bankr.D.Minn.1990).

In *St. Mary* and *St. Joseph's, supra,* the PA Department of Revenue ("the DOR") and the Department of Labor and Industry ("L & I") both filed proofs of claim in the debtors' respective bankruptcy cases, thereby waiving PA's sovereign immunity, which otherwise might have protected the state agency against which the debtors sought relief, the Department of Public Welfare ("DPW"). We take judicial notice of the claims docket in this case, as the court did in *WJM, supra,* 840 F.2d at 1004, and note that, as in the *St. Mary* and *St. Joseph's* cases, the DOR and L & I have filed proofs of claim in this case, in the amounts of $329,488.24 and $476,814.97, respectively. The consequences of these filings for the Defendants in this case must be the same as it was for DPW in the cases noted above. We therefore conclude that PA has waived its sovereign immunity and that the Defendants, as agencies of PA, may not seek dismissal of the Complaint on immunity grounds.

The concept that the filing of a proof of claim effects a submission to bankruptcy court jurisdiction which effects a waiver of significant rights is hardly foreign to bankruptcy jurisprudence. For example, it is clear that filing a claim eliminates any party's otherwise inviolate Seventh Amendment rights to a trial by jury. *See, e.g., Langenkemp v. Culp,* 498 U.S. 42, 44, 111 S.Ct. 330, 331, 112 L.Ed.2d 343 (1990); *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 58–59, 109 S.Ct. 2782, 2799, 106 L.Ed.2d 26 (1989); *In re Lloyd's Securities, Inc.,* 156 B.R. 750 (Bankr.E.D.Pa.1993); and *In re Light Foundry Associates,* 112 B.R. 134, 137–38 (Bankr.E.D.Pa.1990).

In response to the argument that the reading of *Hoffman* presented in *St. Mary* and *St. Joseph's* would emasculate 11 U.S.C. § 106 of meaning and significance, it should be recalled that all of the sections of § 106 apply even when no state agency files a proof of claim. It is also noteworthy that the Debtor here seeks no monetary recovery. Thus, it is difficult to analyze how a § 106(b) offset would operate. It could certainly be argued that the Debtor's non-monetary claim does not offset any or very much against PA's claims, totalling in excess of $800,000.

We also note that reasoning similar to that employed here against the Defendants has been regularly employed by courts confront-

9. The Court's delineation of the scope of the § 106(c) abrogation seems no broader than the scope of permissible federal jurisdiction in the absence of abrogation as defined in *Young, supra,* 209 U.S. at 159–68, 28 S.Ct. at 453–57.

ed with the issue of whether a federal agency, such as the Internal Revenue Service ("the IRS"), can assert immunity to claims against it in light of the Supreme Court's decision in *United States v. Nordic Village, Inc.,* —— U.S. ——, ——, 112 S.Ct. 1011, 1014–16, 117 L.Ed.2d 181 (1992), in which the Court held that § 106 did not effect a waiver of the IRS's sovereign immunity. As this court recently pointed out in *In re Weatherley,* 1994 WL 463974, slip op. at *2 (Bankr. E.D.Pa. August 23, 1994), many courts have gone one step further and held that an assertion of a right against a debtor by the IRS may in itself constitute an "informal proof of claim" sufficient to waive sovereign immunity, citing, *e.g., In re Town & Country Home Nursing Services, Inc.,* 963 F.2d 1146, 1149–54 (9th Cir.1992); *In re Gribben,* 158 B.R. 920, 922–24 (S.D.N.Y.1993); *In re Hudson,* 168 B.R. 449, 451 (Bankr.S.D.Ga.1994); *In re Boldman,* 148 B.R. 874 (Bankr.C.D.Ill.), *aff'd,* 157 B.R. 412 (C.D.Ill.1993); and *In re Tyson,* 145 B.R. 91, 94 (Bankr.M.D.Fla.1992). *See also In re Craftsmen, Inc.,* 163 B.R. 88, 91–93 (Bankr.N.D.Tex.1993) (trustee's filing of a claim *for* a United States agency waives immunity). *Cf. In re Operation Open City, Inc.,* 170 B.R. 818, 822–24 (S.D.N.Y.1994) (a state need not file a formal proof of claim to waive its Eleventh Amendment sovereign immunity).

Here, unlike in *Weatherley,* two of PA's agencies have filed proofs of claim. Therefore, PA has, apparently irrevocably, *see Lloyd's Securities, supra,* 156 B.R. at 754, waived sovereign immunity as to all of its agencies, including the DOE, the DGS, and the GSA.

The Defendants also argue that, even if constitutional sovereign immunity does not "apply," they are still shielded by Pennsylvania's state law sovereign immunity. Although it is true that a state's waiver of immunity in its own courts does not necessarily serve as a waiver in federal court, *see, e.g., Huang v. Board of Governors of University of North Carolina,* 902 F.2d 1134, 1138–39 (4th Cir.1990), certainly when a state affirmatively waives its immunity in *federal court,*

it cannot render such waiver meaningless by then claiming that its state law sovereign immunity remains intact. Furthermore, to the extent that the Defendants are asserting that state law immunity survives Congressional abrogation of constitutional sovereign immunity, their argument runs afoul of the Supremacy Clause. If, however, the Eleventh Amendment had been interpreted not as a grant of constitutional sovereign immunity, but rather as a simple restriction on personal jurisdiction (a position espoused by Justice Brennan in his dissent in *Atascadero, supra,* 473 U.S. at 274–304, 105 S.Ct. at 3163–79 (Brennan J. dissenting)), then a state's common law sovereign immunity might have barred suits against it in federal court even when the hypothetical Eleventh Amendment restriction on personal jurisdiction was otherwise circumvented. Unfortunately for the Defendants, the majority of the Supreme court has not interpreted the Eleventh Amendment in this fashion. Thus, we conclude that sovereign immunity does not preclude the Debtor from obtaining the relief which it seeks here.

### 4. *The Statute of Limitations Is Not a Bar to the Complaint*

As noted above, a declaratory judgment is a procedural device and not a cause of action unto itself. As such, there is no general statute of limitations for actions seeking declaratory judgments. 22A AM. JUR.2d, *supra,* at 828, *Declaratory Judgments,* § 184 ("Limitations statutes do not apply to declaratory judgments as such, since declaratory relief is a mere procedural device by which various types of substantive claims may be vindicated.") (footnote omitted). Rather, as is thusly stated at *id.,* a court must look for the analogue to the plaintiff's declaratory cause of action in the state or federal law, as the case may be, and apply the statute of limitations for that cause of action to the plaintiff's declaratory action:

[a]s a general rule, a statute of limitations applicable to ordinary actions at law and suits in equity applies to actions for declaratory relief. Thus, the blanket provision

found in statutes of limitations fixing the time of institution of all other actions for which no specific limitation has been prescribed by other sections of the statute has been applied to actions for declaratory relief (footnotes omitted).

*Accord,* 26 C.J.S., *supra,* at 241, *Declaratory Judgments,* § 108b ("An action for a declaratory judgment may be barred by a statute of limitations, and, in the absence of a statute providing otherwise, the period of limitation applicable to ordinary actions at law and suits in equity should be applied in like manner to actions for declaratory relief.") (footnotes omitted). *See also Luckenbach Steamship Co. v. United States,* 312 F.2d 545, 548–49 (2d Cir.1963); *Town of Peterborough v. Hartford Fire Ins. Co.,* 824 F.Supp. 1102, 1108 (D.N.H.1993); and *Sumaron v. International Longshoremen's & Warehousemen's Union,* 450 F.Supp. 1026, 1028 (C.D.Cal. 1978). *Cf. Henig v. Odorioso,* 385 F.2d 491, 493 (3d Cir.1967), *cert. denied,* 390 U.S. 1016, 88 S.Ct. 1269, 20 L.Ed.2d 166 (1968) ("Since the Civil Rights Act contains no provision limiting the time within which an action thereunder may be brought, the applicable Statute of Limitations is that which the State would enforce had the action seeking similar relief been brought in State Court.").

The Debtor's Complaint raises issues akin to a claim of an anticipatory breach or other claims arising from a difference of opinion regarding interpretation of the parties' contracts. We disagree with the Defendants' assertion that the applicable statute of limitations begins to run from the date that the contracts were made. This reasoning, taken to its logical end, would mean that a party would find itself without recourse if its contract is breached many years after it was made. Thus, we look to Pennsylvania law not only for the applicable statute of limitations, but also for some guidance regarding the point at which limitations begin to run. We find the answer to both questions in *Wagner v. Apollo Gas Co.,* 399 Pa.Super. 323, 582 A.2d 364 (1990).

In *Wagner,* the plaintiff filed an action for damages and an action for declaratory judg-

ment based on the breach of its natural gas purchase contract with the defendant. 399 Pa.Super. at 325–26, 582 A.2d at 365. The lower court held that both actions were barred by the statute of limitations. *Id.* The plaintiff only appealed the decision as it applied to its declaratory judgment action, which sought a declaration of the parties remaining rights and obligations under the contract. The Superior Court thusly held that it was improper to measure the limitation period applicable to the declaratory judgment action from the date of the breach:

> [i]n its opinion, the lower court found that a contract for the sale of gas must be deemed a contract for the sale of goods under our Commonwealth's codification of the Uniform Commercial Code. As a result, the lower court correctly stated that appellant's breach of contract claim was time-barred pursuant to the applicable statute of limitations. We note, however, that this section is applicable only to actions for breach of contract, with the limitations period starting at the time of the breach. Thus, while we agree with the trial court's conclusion that appellants' breach of contract case is time-barred, we reach a different conclusion with regard to appellants' declaratory judgment action.

> Our research fails to reveal the prescription of a specific statute of limitations with regard to declaratory judgment actions.... To start the running of the statute of limitations in a declaratory judgment action from the time of a contract breach when such a cause of action may arise regardless of the existence of a breach is both inconsistent and illogical. *Since we find no specific articles of Section 5525 applicable, we find the four year "catch all" statute of limitations appropriate in this instance. 42 Pa.C.S.A. § 5525(8).*

> In order to sustain an action under the Declaratory Judgments Act, a plaintiff must demonstrate an "actual controversy" indicating imminent and inevitable litigation, and a direct, substantial and present

interest.[10] *Because an action for declaratory judgment cannot be sustained until these elements can be shown to exist, it follows that a cause of action for declaratory judgment does not arise until such "actual controversy" exists.*

*Id.* at 326–27, 582 A.2d at 366 (some citations omitted) (emphasis added). *Accord American Motorists Ins. Co. v. Farmers Bank & Trust Co. of Hanover,* —— Pa.Super. ——, 644 A.2d 1232, 1235 (1994). *See also* 22A AM.JUR.2d, *supra,* at 828, *Declaratory Judgments,* § 184 ("Since no cause for declaratory relief accrues until there is an actual controversy, the statute of limitations does not begin to run until such controversy occurs.") (footnote omitted); 27 C.J.S., *supra,* at 242, *Declaratory Judgments,* § 108b ("A statute of limitations does not bar the bringing of an action where, although the rights were created a long time ago, they continue to exist and only recently were denied.") (footnote omitted). Consistently with the foregoing, the *Wagner* court concluded that the controversy over the continuing viability of the contract occurred *after* the actual breach, and that the declaratory judgment action was filed within four years from the significant date that the controversy arose. 399 Pa.Super. at 377–78, 582 A.2d at 366–67. *See also In re C.L. Whiteside & Associates Construction Co.,* 118 B.R. 886, 887–89 (Bankr.S.D.Fla.1990) (the statute of limitations on debtor's declaratory judgment action to determine whether transaction was equipment lease or secured purchase money loan held not to begin running until "the last element constituting the cause of action occurs," which, in that case, occurred well after the agreement was made when debtor discovered the final operative fact necessary to support its declaratory judgment action). *Cf. Vernau v. Vic's Market, Inc.,* 896 F.2d 43, 45–46 (3d Cir.1990) (limitations generally run only from the time that the plaintiff should have discovered the cause of action in issue).

In this case, the Debtor alleges that it was not aware of the Defendants' position regarding the nature of the parties' transactions contrary to its own until January, 1994. Thus, the "actual controversy" surrounding the interpretation of the contracts in issue did not arise until that time. Therefore, the Complaint was filed well within the applicable four year statute of limitations for declaratory judgment actions.

5. *The Statute of Frauds Is Not a Bar to the Debtor's Complaint*

 It is clear from the Defendants' Motion that they raise the statute of frauds issue not to dispute the existence of the parties' contracts, but rather to question their enforceability.[11] This distinction is meaningful. *Cf. Schulman v. J.P. Morgan Investment Management, Inc.,* 35 F.3d 799, (3d Cir. 1994) (part performance of a contract and an agent's signature thereon is sufficient to take contract out of the statute of frauds even though the contract may still not be enforceable without the signature of the party with the right of approval).

 As is pointed out by the Debtor, the purpose of the statute of frauds is to prevent parties from fabricating oral agreements concerning real property where none exist. *See, e.g., Haskell v. Heathcote,* 363 Pa. 184, 188,

---

**10.** Although the court is referring to Pennsylvania's Declaratory Judgments Act, "actual controversy" is defined therein much the same way as it is under federal law. *Compare* page 820 n. 7 *supra.*

**11.** Pennsylvania's applicable statute of frauds provides as follows:

[A]ll leases, estates, interests of freehold or term of years, or any uncertain interest of, in, or out of any messuages, manors, lands, tenements or hereditaments, made or created by livery and seisin only, or by parol, and not put in writing, and signed by the parties so making or creating the same, or their agents, thereunto lawfully authorized by writing, shall have the force and effect of leases or estates at will only, and shall not, either in law or equity, be deemed or taken to have any other or greater force or effect, any consideration for making any such parol leases or estates, or any former law or usage to the contrary notwithstanding....

33 P.S. § 1. Clearly, the statute of frauds applies to the parties transaction.

69 A.2d 71, 73 (1949) ("The object of the statute [of frauds] is to prevent the assertion of verbal understandings in the creation of interests or estates in land and to obviate the opportunity for fraud and perjury."). Here, by implication if not expressly, the Defendants acknowledge the existence of the parties' agreements. This alone may be sufficient to defeat the Defendants' statute of frauds attack. *See, e.g., Zlotziver v. Zlotziver,* 355 Pa. 299, 302, 49 A.2d 779, 781 (1946) ("[I]f title holder admits, either in his pleadings or his testimony, that he did in fact enter into the contract, the purpose of the statute of frauds is served and the oral agreement will be enforced by the court.").

Nor do we think the absence of the Governor's signature on the Subleases poses a problem under the statute of frauds. We note that the signatures of at least certain representatives of the government agencies against whom the Debtor wishes to enforce the agreements are found on the various documents. 16 P.L.E. 488, *Frauds, Statute of,* § 58 (1959), and cases cited therein ("The only signature generally necessary is that of the person against whom the contract is sought to be enforced.") (footnote omitted).[12] These signatures, along with the various terms and conditions found in the several documents, taken together, may be used to satisfy the requirement of a signed, written memorandum under the statute of frauds. *See, e.g., Sall v. Mueller Brass Co.,* 361 Pa. 449, 452, 65 A.2d 236, 237 (1949) (" 'The

required memorandum for [the] ... purpose [of the statute of frauds] need not be a single writing, entire within itself; it may consist of several writings; and, if they bear connecting reference one to the other or have even an undisclosed but actual relation, which oral evidence may be used to show, they may be sufficient, when taken together, to supply the statute's requirement for a writing....' "), quoting *Brister & Koester Lumber Corp. v. American Lumber Corp.,* 356 Pa. 33, 39, 50 A.2d 672, 676 (1947).

Furthermore, the parties' part performance under the contracts in issue over the years also appears to take this agreement out of the statute of frauds.[13] *See United States v. 29.16 Acres, etc.,* 496 F.Supp. 924, 929 (E.D.Pa.1980) ("A further exception to the statute of frauds is that when a purchaser of property has taken possession and made improvements, his case is not within the statute, because the fact of possession is sufficient evidence that the parties intended to create the estate claimed by the purchaser."); and *Klingensmith v. Klingensmith,* 375 Pa. 178, 183–84, 100 A.2d 76, 77–78 (1953) (part performance which cannot be adequately compensated in damages and which makes rescission inequitable and unjust may take a contract out of the statute of frauds). *See also Valvano v. Galardi,* 363 Pa.Super. 584, 586–89, 526 A.2d 1216, 1218–19 (1987) (sufficient part performance takes one amendment to an agreement, which granted the vendee a right of way, out of the

---

12. As we noted at page 4 n. 2 *supra,* the copy of Sublease Two which is attached to the Complaint is not signed at all. However, Sublease One, which is signed by the DOE, refers to Lease Two which in turn refers to Sublease Two. *See Dalkiewicz v. Redevelopment Authority of Luzerne County,* 403 Pa.Super. 244, 247–48, 588 A.2d .932, 934 (1991) ("The memorandum can consist of several writings ... if each writing is signed by the party to be charged and the writings indicate that they relate to the same transaction, or ... though only one writing is signed if ... the signed writing is physically annexed to the other writing by the party to be charged, or ... the signed writing refers to the unsigned writing, or ... it appears from examination of all the writings that the signed writing was signed with reference to the unsigned writing."); and *Fleming v. Strayer,* 163 Pa.Super. 607, 610, 63 A.2d 122, 124 (1949) (same).

13. Of course, the statute of frauds also applies to leases with terms exceeding three years. *See* 33 P.S. § 1. Thus, even if the parties' transaction only forms a leasehold relationship as alleged by the Defendants, any statute of frauds deficiencies would still be relevant. Yet those deficiencies apparently did not keep the Defendants from applying state appropriations earmarked for the Debtor against the Debtor's "rent" obligation under the Subleases. *See In re Estate of Brojack,* 321 Pa.Super. 154, 167, 467 A.2d 1175, 1182 (1983) ("Specific evidence that would make recision of an oral contract inequitable and unjust will take such contract outside the statute of frauds; partial performance, which has benefitted the party invoking the statute, will, in appropriate circumstances, bar the invocation of the rule.").

statute of frauds, especially since the vendee purchased certain other parcels of land and needed the right of way if it ever intended to exercise its option to purchase additional parcels, which were otherwise landlocked).[14]

Thus, we conclude that the statute of frauds is not implicated, as there is certainly no question that an agreement, at least part of which has been reduced to writing, exists between these parties. What that agreement is, and whether it can be enforced in the absence of the Governor's signature, remains to be seen. We decline to address those issues now, however, because they were not squarely raised by the Defendants as grounds to dismiss the Complaint, nor were they discussed by the Debtor in its response to the Motions.

6. *The DOE's Alleged Lack of Authority to Transfer Title to Real Property Is Not a Bar to the Debtor's Complaint at This Time*

 The Defendants' final argument concerning the DOE's inability to transfer title to the Property actually merely questions one of the Debtor's prayers for relief. It is impossible to say at this time, prior to our consideration of the merits of the Complaint, whether the Debtor is entitled to the Property, much less who would be responsible for transferring the title to Debtor if it were.[15] If the "turnover" relief were connected to its own count in the Complaint, and that count were legally deficient, then we may have had cause to dismiss at least part of the Complaint. But we find that the Complaint alleges sufficient facts which, if proven, may entitle the Debtor to at least the declaratory relief it seeks. To the extent that the Debtor may have asked for more than it is entitled to,[16] we will not award such relief. However, the question of appropriate relief awaits another day. The presence of an overly-ambitious prayer for relief in a complaint certainly does not warrant the entire Complaint's dismissal.

D. CONCLUSION

For all of the foregoing reasons, the Motions to Dismiss are denied in the attached Order.

ORDER

AND NOW, this 5th day of October, 1994, upon consideration of the Motion of the Commonwealth of Pennsylvania Department of

---

14. Similarly, the Property involved in this case is allegedly landlocked by other property owned by the Debtor. It seems unlikely to us that the Debtor would unconditionally and permanently deed away landlocked property in the heart of its campus.

15. Indeed, the Debtor responds to this argument by arguing that the DGS would be the party obligated to transfer the title back to the Debtor. In fact, the Debtor's prayer for relief in this regard specifically identifies the DGS as the appropriate transferee. Apparently there is no restriction on the DGS's ability to transfer real property.

16. For example, the Debtor also asks us, in the alternative, to "direct[] the Commonwealth of Pennsylvania, by and through the Department of General Services, to convey title to [the Property] to the Debtor, under and subject to a mortgage in a principal balance, if any, to be determined after trial, at an annual rate of interest of 3.632169% ...." It is unclear whether we can grant this type of relief under the guise of a declaratory judgment action. *See Thompson v. Baltimore &*

*O. R.R.,* 155 F.2d 767, 772 (8th Cir.), *cert. denied,* 329 U.S. 762, 67 S.Ct. 122, 91 L.Ed. 657 (1946) ("A court cannot by declaratory judgment made contracts for parties before it...."); 22A AM. JUR.2d, *supra,* at 722, *Declaratory Judgments,* § 63 ("In a declaratory judgment action for the construction of a contract, a court will not undertake to make a contract for the parties.") (footnote omitted); and 26 C.J.S., *supra,* at 151, *Declaratory Judgments,* § 54 ("[W]hile the courts may construe contracts, they may not modify or supplement contracts or make contracts for the parties.") (footnotes omitted). *Cf. McWilliams v. McCabe,* 406 Pa. 644, 647–58, 179 A.2d 222, 225–29 (1962) (court cannot use declaratory judgment to reform contract under the guise of construing it); and *New London Oil Co., Inc. v. Ziegler,* 336 Pa.Super. 380, 383, 485 A.2d 1131, 1133 (1984) (same). Instead, we expect that we will interpret the parties' agreement and help clarify their obligations thereunder. Once these obligations are made clear, presumably the parties will act in accordance with them. If this means the Debtor is, or will be, entitled to the Property, so be it.

Education and the Commonwealth of Pennsylvania Department of General Services to Dismiss the Complaint of the Debtor in this proceeding, and upon consideration of the nearly identical Motion filed by the General State Authority, and having reviewed the Briefs submitted by the respective parties in support of their positions, it is hereby ORDERED AND DECREED that the Motions are DENIED.