In re The LESLIE FAY COMPANIES, INC., et al., Debtors.

Albert NIPON and American Pop Marketing Group, Inc., Plaintiffs,

v.

The LESLIE FAY COMPANIES, INC., et al., Defendants.

The LESLIE FAY COMPANIES, INC. and Leslie Fay Licensing Corp., Counterclaim-plaintiffs,

v.

Albert NIPON and American Pop Marketing Group, Inc., Counterclaim-defendants.

Bankruptcy No. 93 B 41724(TLB). Adversary No. 96–8215A (JHG).

United States Bankruptcy Court, S.D. New York.

Dec. 23, 1997.

Spector Gadon & Rosen, P.C. by Daniel J. Dugan, Philadelphia, PA, for Albert Nipon and American Pop Marketing Group, Inc.

Weil, Gotshal & Manges LLP by R. Bruce Rich, New York City, for Leslie Fay Companies, Inc., et al.

*DECISION ON STIPULATED FACTS*

JEFFREY H. GALLET, Bankruptcy Judge.

## I. Introduction

This controversy was submitted on stipulated facts. The facts are considered as though they were received on trial. Albert Nipon ("Nipon") and American Pop Marketing Group, Inc. ("American Pop") seek a declaratory judgment[1] against the Leslie Fay Company, Inc. ("Leslie Fay") to determine the manner in which Nipon may use his name in conjunction with American Pop goods.[2] Leslie Fay and its subsidiary, Leslie Fay Licensing Corp. (together the "Leslie Fay Companies") counterclaim and allege (1) trademark infringement under 15 U.S.C. §§ 1114, 1116 and 1117 (or the Lanham Act); (2) trademark infringement and false sponsorship, association and endorsement under 15 U.S.C. §§ 1116, 1117 and 1125(a); (3) trademark dilution of a famous mark under 15 U.S.C. § 1125(c); (4) violations of New York General Business Law § 368–d; and (5) unfair competition under the common law. For the reasons set forth below, I decline to issue a declaratory judgment and find Plaintiffs in violation of the Lanham Act sections 32, 43(a) and 43(c), New York General Business Law § 368–d, and the common law unfair competition.

---

**1.** Plaintiffs' complaint also alleged breach of contract, intentional interference with contractual relationships, and intentional interference with prospective contractual relationships. *See Compl.* ¶¶ 21–39, 46–54 & 55–58. However, Plaintiffs chose not to pursue those claims at this time. *See Plaintiffs Trial Brief*, at 2 n. 1.

## II. Discussion

Nipon, a well-known clothing designer, was the founder and Chairman of the Board of Albert Nipon, Inc., of which he and his wife, Pearl Nipon, were the principal shareholders. Nipon is also the founder, sole shareholder, Chairman and Chief Executive Officer of American Pop. Leslie Fay is engaged in the design, manufacture, marketing and sale of women's apparel in the wholesale market and in the retail market through their own discount stores. In addition, Leslie Fay also licenses its brand names to producers of men's and women's accessories.

In 1987, Albert Nipon, Inc. filed for bankruptcy protection in the Eastern District of Pennsylvania. Its primary assets were its Albert Nipon trademarks and the goodwill connected with the Albert Nipon name. In 1988, the bankruptcy court approved a contract of sale (the "Sale Agreement") pursuant to which Albert Nipon, Inc. sold Leslie Fay certain of its assets, including substantially all of the existing Albert Nipon trademarks, trade names and related goodwill ("Nipon Trademarks") for $1,000,000. Section 3.1(m) of the Sale Agreement, signed by Nipon, provided that "[n]o stockholder, officer, director or employee of the Seller owns or has any interest in any trademark, service mark, trade name, copyright or application therefor, or trade secret, if any, used by the Seller in connection with its business." Leslie Fay maintains a federal trademark registration for "Albert Nipon," "Nipon Boutique," "Executive Dress by Albert Nipon," "Albert Nipon Suits," "Nipon Studio," and "Nipon Petites."

In connection with the sale, the Nipons each entered into a separate employment agreement with Leslie Fay for their employment through April 15, 1993. The Nipons were each to be paid $300,000 per annum (increasing to $375,000 per annum) and a

---

**2.** The court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This is a core matter under 28 U.S.C. § 157(b)(2)(A).

124

percentage of the Nipon Division sales and other Nipon Trademarks sales. In addition, each employment agreement contained a non-competition clause, providing that the Nipons

> covenant[ ] and agree[ ] that until two years after termination of his [or her] employment with the Company, he [or she] shall not directly or indirectly: (i) Compete with or be engaged in the same business as the Company or any parent, subsidiary, or affiliate of the Company, or employed by, or act as consultant or lender to, or be a director, officer, employee, owner, or partner of, any business or organization which, at the time of such termination, directly or indirectly competes with or is engaged in the same business as the Company....

The non-competition clauses also provided that after termination of the employment agreements (other than for material breach by the Nipons), the Nipons agreed to serve as lifetime consultants to Leslie Fay, and work a minimum of ten hours per week with compensation not less than $25,000 per annum attributed against royalties received.

The essence of the two transactions was that Nipon, who had made his name his trademark and built goodwill in it, transferred that trademark to his family owned corporation, Albert Nipon, Inc. That corporation had suffered financial reverses and obtained the protection of the Bankruptcy Code. Using the Code, Albert Nipon, Inc. stripped the trademark of its encumbrances and sold it to Leslie Fay for $1,000,000. The Nipons made their own deal with Leslie Fay to promote the trademark, for which they were paid millions of dollars in addition to what Leslie Fay paid the Albert Nipon, Inc. bankruptcy estate.

■ I must first address what Leslie Fay bought. The sale of a trademark includes the sale of the mark along with the goodwill and tangible business assets that go along with the trademark. *United States Ozone Co. v. United States Ozone Co.*, 62 F.2d 881, 885–86 (7th Cir.1933); *In re Gucci*, 202 B.R. 686 (Bankr.S.D.N.Y.1996). It would be impossible for the Albert Nipon, Inc. bankruptcy estate to sell the trademark without the other essential items that go along

with it. "A trademark is not a property right in gross which may be sold apart from the business or goodwill with which the trademark has been associated." *Marshak v. Green*, 746 F.2d 927, 929 (2d Cir.1984).

■ Moreover, "[w]hen a business purchases trademarks and goodwill, the essence of what it pays for is the right to inform the public that it is in possession of the special experience and skill symbolized by the name of the original concern, and the sole authority to market its products." *Levitt Corp. v. Levitt*, 593 F.2d 463, 468 (2d Cir.1979). Therefore, "[t]o protect the property interest of the purchaser, then, the courts will be especially alert to foreclose attempts by the seller to 'keep for himself' the essential thing he sold, and also keep the price he got for it." *Id.* (citing *Guth v. Guth Chocolate Co.*, 224 F. 932, 934 (4th Cir.), *cert. denied*, 239 U.S. 640, 36 S.Ct. 161, 60 L.Ed. 481 (1915)).

Upon the acquisition of the Nipon Trademarks, Leslie Fay established a Nipon Division for the design and production of dresses and sportswear. In addition, Leslie Fay began designing and manufacturing "better priced" women's suits under the Nipon Trademarks through its Sassco Division. Since 1988, the Leslie Fay Companies have licensed the Nipon Trademarks to various companies; but not American Pop. The Leslie Fay Companies license the Albert Nipon Trademarks to companies for goods including women's suits, coats, and outerwear, and men's neckwear, slacks, coats, topcoats, rainwear, sports jackets, suits, dress shirts and formalwear. Leslie Fay does not produce or market watches, but is considering it. In 1991, Leslie Fay assigned the Nipon Trademarks to its subsidiary, Leslie Fay Licensing. In 1996, Leslie Fay grossed more than $35,000,000 from Nipon sales and license fees.

On April 5, 1993, Leslie Fay filed for protection under the Code. Pursuant to § 365(a) of the Code, Leslie Fay rejected the Nipons' employment agreements. The Nipons settled their claims against Leslie Fay for $100,000 each.

Nipon consulted Panitch Schwarze Jacobs & Nadel (the "Panitch Firm"), a Philadelphia

law firm, on how he may use his name in connection with the design and manufacture of apparel. The Panitch Firm issued seven, not entirely consistent, opinion letters between May 6, 1993 and October 11, 1995.

In August 1995, American Pop entered into a license agreement with Kantor Brothers Neckwear Co., Inc. ("Kantor Brothers") for the use of the American Pop label on its men's and boy's neckties.[3] The tie labels contained the American Pop trademark. Beneath the trademark, in smaller type, the label read "CREATED BY ALBERT NIPON." A hang tag, pinned to each tie, had the same information and the words, "THIS GARMENT IS NOT LICENSED OR UNDER THE AUTHORIZATION OF THE OWNER OF THE ALBERT NIPON REGISTERED TRADEMARKS." In January and February 1996, advertisements for American Pop neckwear, boxer shorts, suspenders, and watches appeared in "MR," a menswear retailing magazine.[4] These Kantor Brothers goods, licensed by American Pop, were displayed at a semi-annual men's apparel trade show in Las Vegas, Nevada ("The Magic Show"). At the August 1995 Magic Show, there was a clash between Castle Neckwear, Inc. (a licensee of the Albert Nipon trademark by the Leslie Fay Companies) and Kantor Bros, each of whom was exhibiting products with the Albert Nipon name.

In November 1994, American Pop entered into a license agreement with Ankuo International Corp. ("Ankuo"), for the production, marketing and sale of watches. Ankuo sells the watches at stores in the United States and Europe. The Ankuo watches were initially packaged in a box with "AMERICAN POP" written on the top. On the bottom of the box was the "legend" "created by Albert Nipon," in the form of a signature, along with a disclaimer identical to the one used on Kantor Brothers' ties. After the initial packaging of the watch boxes, Nipon affixed a sticker on the front of the boxes with the

same "legend" as the back and a disclaimer of similar size below it. The disclaimer on the back of the box is substantially smaller than the "legend."

In January 1995, the Nipons commenced an adversary proceeding against Leslie Fay for a declaratory judgment that they were no longer bound by the non-competition covenants of their employment agreements. The court (Brozman, J.) ruled that the Nipons had neither pleaded nor proved that they had used the name nor had they presented a concrete proposal of their intentions to use the name. Thus, she held they failed to demonstrate a sufficient "case or controversy" to permit declaratory relief as to the use of the Albert Nipon name.

Nipon and American Pop commenced this proceeding for a declaratory judgment. The Leslie Fay Companies conducted a consumer survey entitled "Likelihood of Confusion Study" and then answered and asserted their counterclaims for trademark infringement.

## III. Law

### A. Trademark Infringement Under Sections 32 and 43(a) of the Lanham Act

The Leslie Fay Companies assert that Counterclaim Defendants violated Sections 32 and 43(a) of the Lanham Act, see 15 U.S.C. § 1114 (West 1997); id. § 1125(a) (West 1998), by marketing and selling neckwear and other goods incorporating the Nipon Trademarks on their labels, packaging and associated promotional material, including display of goods at apparel trade shows. These acts, the Leslie Fay Companies assert, have caused, and will continue to cause, confusion among Leslie Fay customers and confusion as to Nipon's and American Pop's association with Leslie Fay and its licensees and their sponsorship of goods. The Leslie Fay Companies seek injunctive relief pursuant to 15 U.S.C. §§ 1116 & 1117. For the reasons set forth below, I find that Nipon and American Pop infringed the Leslie Fay

---

**3.** Kantor Brothers neckties are made of polyester and sell for retail between $9 and $20. These ties sell at stores including Peoples, Virginia, Tie One On, Knot Shops, Ames, Bradlees and Clover.

**4.** The American Pop license authorized use of the mark on a broader array of products including men's and boy's mufflers, men's braces, men's boxers and men's t-shirts. To date, Kantor Brothers only uses the mark on neckwear.

Companies' trademark pursuant to Sections 32 and 43(a) of the Lanham Act, and are enjoined from further marketing of the Nipon Trademarks.

■ The Lanham Act was designed to prevent likely confusion in the minds of consumers as to the: (1) relationship between trademark holders and a competitor seeking to use the trademark or a substantially similar mark in its own marketing efforts, and (2) the source of the product being represented by the trademark or a substantially similar mark. *Home Box Office, Inc. v. Showtime/The Movie Channel,* 832 F.2d 1311, 1314 (2d Cir.1987).

■ The relevant portion of Section 32 provides:

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive;

\* \* \*

shall be liable in a civil action by the registrant for the remedies. . . .

15 U.S.C. § 1114(1) (West 1997). The relevant portion of Section 43(a) provides:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or os likely to be damaged by such act.

15 U.S.C. § 1125(a)(1) (West 1998). The remedy for violation under these sections may be injunctive relief. *See* 15 U.S.C. § 1114(2)(C) (West 1997); *see also* 15 U.S.C. § 1116(a) & 1125(a) (West 1998). In addition, 15 U.S.C. § 1117 states that the senior user may be entitled, subject to provisions of 15 U.S.C. §§ 1111 and 1114 and subject to the equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of action. *See* 15 U.S.C. § 1117 (West 1998).[5]

■ In the Second Circuit, the analysis for violation of either Sections 32 or 43(a) of the Lanham Act is the same. *See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 871 (2d Cir.1986) ("in either a claim for infringement under § 32 or a claim for unfair competition under § 43 [of the Lanham Act], a prima facie case is made out by showing the use of one's trademark by another in a way that is likely to confuse consumers as to the source of the product."). Accordingly, I analyze violation of both sections together.

■ In this circuit, to find infringement, I must find "a likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question," *Hormel Foods Corp. v. Jim Henson Prod., Inc.,* 73 F.3d 497, 502 (2d Cir.1996) (*citing Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 47 (2d Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979)), or that there might be confusion as to the senior user's relationship with the junior mark (e.g., a sponsorship). *See Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 204–05 (2d Cir.1979). The ultimate question is

---

**5.** Leslie Fay and Nipon agreed to litigate the issue of special damages at a later time.

whether consumers are likely to be confused. *See Paddington Corp. v. Attiki Importers & Distribs., Inc.*, 996 F.2d 577, 584 (2d Cir. 1993); *Clinique Labs., Inc. v. Dep Corp.*, 945 F.Supp. 547, 551 (S.D.N.Y.1996). Once the trademark holder has demonstrated a substantial likelihood of confusion, both Sections 32 and 43(a) of the Lanham Act are satisfied. *See Lois Sportswear*, 799 F.2d at 871.

The likelihood of confusion is determined by an analysis and balancing of the following non-exclusive factors: (1) the strength of the senior party's mark; (2) the degree of similarity between the two marks; (3) the competitive proximity of the products; (4) the existence of actual confusion; (5) the likelihood that the senior mark holder will "bridge the gap" between the two markets (if the products are different); (6) the junior user's good faith in adopting the mark; (7) the quality of the product(s); and (8) the sophistication of purchasers. *Sterling Drug. Inc. v. Bayer A.G.*, 14 F.3d 733, 740 (2d Cir.1994); *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); *Clinique Labs., Inc.*, 945 F.Supp. at 551. In addition, post-sale consumer confusion is also actionable and considered under this test. *See Lois Sportswear*, 799 F.2d at 872–73. All of these factors need not be satisfied. *See Charles of the Ritz Group Ltd. v. Quality King Distribs., Inc.*, 832 F.2d 1317, 1321 (2d Cir.1987). Rather, they should be balanced to determine the potential likelihood of consumer confusion. *Id.*

### 1. Strength of the Mark

The strength of a mark is assessed by its distinctiveness or "'more precisely, [by] its tendency to identify the goods sold under the mark as emanating from a particular ... source.'" *Clinique*, 945 F.Supp. at 551 (*quoting McGregor–Doniger v. Drizzle Inc.*, 599 F.2d 1126, 1131 (2d Cir. 1979)). A trademark may be inherently distinctive because it is based upon a personal name which is distinctive. *See Sally Gee Inc. v. Myra Hogan Inc.*, 699 F.2d 621, 625 (2d Cir.1983); *McGregor–Doniger*, 599 F.2d at 1131. Registered trademarks are presumed to be distinctive and are afforded the utmost

protection under the Lanham Act. *Lois Sportswear*, 799 F.2d at 871. The Albert Nipon name is such a trademark and deserves the utmost protection. Leslie Fay, as the owner of the trademark, is the beneficiary of that protection.

The parties do not dispute that the Nipon Trademarks, which have existed for fifteen years, are strong in the marketplace. My own examination confirms that the mark is strong. In 1996, Leslie Fay's Sassco Division earned $26 million in gross sales from the Nipon Trademarks and $12.5 million from its licenses. Moreover, Leslie Fay purchased the Nipon Trademarks for $1 million and paid substantial salaries to the Nipons to oversee the marks. These are strong indicia, and quantifiable evidence, of the Nipon Trademarks' strength. *See Charles of the Ritz*, 832 F.2d at 1321; *Clinique*, 945 F.Supp. at 551–52.

### Similarity of the Marks

Similarity in appearance, sound and meaning strongly support a finding of likelihood of confusion between two trademarks. *See Clinique*, 945 F.Supp. at 552. The name "Albert Nipon" is prominently displayed on both Leslie Fay and American Pop goods. In fact, in some instances even the typeface used to print the name "Albert Nipon" is similar. I have reviewed the samples of American Pop ties and watch boxes and compared them to Leslie Fay products bearing the Nipon Trademarks. I note that, although Nipon chose to include his signature on the watch boxes in an attempt to differentiate the marks, the typeface on American Pop neckwear stating "Created by Albert Nipon" is distinctly similar to those Leslie Fay labels bearing the Nipon Trademarks. This use of unique typeface enhances the already strong resemblance between the marks. *Cf. Grotrian, Helfferich, Schulz, Th. Steinweg Nachf., v. Steinway & Sons*, 523 F.2d 1331 (2d Cir.1975) (finding that it was appropriate for a court to consider difference in typeface of two marks and to make visual comparison).

The use of the Albert Nipon name on at least one of the registered trademarks, "Executive Dress by Albert Nipon," is remark-

ably similar to the mark and legend of American Pop created by Albert Nipon. This phrasing is commonly used by established trademarks in the apparel and accessory industry. Thus, potential purchasers could easily be confused by such similar and usual phrasing encompassing Nipon's full name on a label, hangtag, advertising or promotional material. In summary, this direct parallel of placement of the name on the American Pop labels is very similar to the current valid use and expected valid uses of Leslie Fay for the Nipon Trademarks. Thus the labels and promotional material used for American Pop are not sufficient as unique identifiers of a distinctly different source for the products.

Furthermore, the name Albert Nipon is itself a distinctive mark. The Nipons spent considerable time and effort to promote the name as a symbol of quality and style. Leslie Fay bought that name when it paid $1,000,000 to the Albert Nipon, Inc. estate. It then put additional effort and money, including more than $2,000,000 in salary to the Nipons, to further the name. Unlike a logo or a distinctive package, the Nipon name itself, in any form, is part of the mark.

▇▇▇▇▇ Nipon and American Pop argue that their use of a disclaimer insulates them from liability. In this circuit, disclaimers are viewed to be adequate where "they are sufficient to avoid substantially the risk of consumer confusion." *Home Box Office,* 832 F.2d at 1315. Each case must be judged under its own "circumstances of the relevant business and its consumers." *Id.* Here, American Pop and Nipon have not met the heavy burden of providing sufficient evidence that their disclaimer significantly reduces the likelihood of consumer confusion. *Id.* at 1316. I find the disclaimer language ineffective to reduce the likelihood of consumer confusion. Nipon's disclaimer merely states that it is not the entity allowed to use the registered trademark. This language does not make the mark less confusing to a consumer. Brief words, such as "no" or "not," are generally ineffective to dispel confusion. *Id.*[6]

Nipon and American Pop argue that its use of the Albert Nipon name and signature, in conjunction with a disclaimer, should be permitted as analogous to *Taylor Wine Co., Inc. v. Bully Hill Vineyards, Inc.,* 569 F.2d 731 (2d Cir.1978) (allowing a signature and disclaimer on bottles of wine), where the Second Circuit found the District Court's preliminary injunction overly broad. In that case, the Second Circuit noted that "every product has its own separate threshold for confusion or origin." *Id.* at 732. In this industry, the Albert Nipon name carries a strong reputation. Indeed, this reputation is evidenced by Leslie Fay's sales and royalties. Thus, where the name Albert Nipon appears on garments, ties or watches, the threshold for confusion is extremely low.

Accordingly, the similarity of the marks weighs heavily toward a finding of a likelihood of confusion. The use of a disclaimer does not mitigate this finding.

### 3. Commercial Proximity of the Products

▇▇▇▇▇ Under this factor, the issue is "whether, due to the commercial proximity of the competitive products, consumers may be confused as to their source." *Clinique,* 945 F.Supp. at 553 (citing *Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 77 (2d Cir. 1988)). I must examine two key factors: (1) the nature of the products; and (2) the structure of the relevant market. *Id.* Under this analysis, it is relevant to consider the class of the consumer, the manner of advertising, the channels of distribution, and the class of the goods. *Id.*[7]

This controversy arises over the use of the Nipon name on ties. Nipon and American

---

6. The Second Circuit notes that some academic literature criticizes precisely the type of disclaimer language employed here—using brief negator words such as "no" or "not,"—as generally ineffective. *Home Box Office,* at 1316–17 (citing Jacoby & Raskoff, *Disclaimers as a Remedy for Trademark Infringement Litigation: More Trouble Than They Are Worth?,* 76 Trademark Rep. 35, 54 (1986)).

7. The phenomenon of cross-shopping, as argued by Leslie Fay, where department store shoppers visit mass market retail stores in order to purchase goods could be relevant here. However, I do not reach that issue, because Leslie Fay provided no evidence of its existence.

Pop went to great length to demonstrate that their ties are distinctive from the ones Leslie Fay licenses. Indeed, they argue that the American Pop ties are made of synthetic materials and are lower priced than Leslie Fay's. However, ties are ties. They retail within a few dollars of each other, and are promoted at the same trade shows. Thus, they are in close proximity with each other.

■ Price differential between two products is a valid consideration to assess consumer sophistication. *See Life Indus. Corp. v. Star Brite Distrib., Inc.*, 31 F.3d 42 (2d Cir.1994). Leslie Fay is a producer of "moderate and better priced" apparel. Leslie Fay neckwear retails between $25 to $40, at full price, while American Pop ties are priced between $9 and $20. A five dollar difference between the cost of the ties creates potential overlap of consumers. Moreover, I cannot predict what the cost of American Pop ties, which are new to the marketplace, will be in the future. Indeed, they may soon sell for the same as Leslie Fays ties. Thus, consumer sophistication does not help resolve whether the products are in close proximity in the marketplace. It is, at best, unclear if the price difference will alert consumers to the difference in the Albert Nipon labeled ties.

American Pop and Leslie Fay advertise in close proximity.[8] American Pop and Leslie Fay advertised goods bearing the Albert Nipon name at the same trade shows. This simultaneous appearance of Kantor Brothers and Castle Neckwear, Inc. at the Magic show may provide the best evidence that American Pop and Leslie Fay market in close proximity.

■ To evaluate the class of goods, I must consider whether the products are the same type of goods or complimentary goods. Here, both parties license neckwear, thus they are in competition even with different price points. It would take an extraordinary consumer to conclude that the Albert Nipon tie at $20 is distinct from the Albert Nipon tie at $25.

Therefore, after weighing all these considerations, I find that the proximity of the products in the market is sufficiently close to create a likelihood of confusion in both consumers and wholesalers.

### 4. Bridging the Gap Between any Differences in the Products

■ The issue, in this analysis, is whether the two companies are likely to directly compete in the same market, *see Charles of the Ritz Group Ltd. v. Quality King Distribs., Inc.*, 832 F.2d 1317, 1321 (2d Cir.1987), or "the average customer's perception of the likelihood that [Nipon] would enter [Leslie Fay's] market." *See The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 963 (2d Cir.1996). Because American Pop and Leslie Fay each market ties, advertise at the same trade shows and are likely to develop other similar products, I find that they currently compete in the same market and are likely to compete, in the future with other products, in the same market. Indeed, Nipon initially intended to market his neckwear line in direct competition with Leslie Fay's licensee, Castle Neckwear, Inc., but lowered his price point after receiving marketplace feedback. *See Nipon Aff.* at 148–49 (stating the original price of neckties were to be $30 to $35). *Cf. Charles of the Ritz*, 832 F.2d at 1322, (finding that the junior user's effort or lack thereof to enter the senior user's more luxury market was relevant to potentially bridging the gap). Furthermore, trademark law protects Leslie Fay's right to enter a related fields, such as watches. *See Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 504 (2d Cir.1996); *Lois Sportswear*, 799 F.2d at 874; *Clinique*, 945 F.Supp. at 555. Leslie Fay and American Pop have each stated its intent to introduce new products into the "apparel and accessory industry." Thus, there is strong likelihood of consumer confusion and potential that the products will be in even a closer commercial proximity in the future.

### 5. The Junior User's Good Faith

■ The inquiry here is " 'whether [American Pop] adopted its mark with the intention of capitalizing on [Leslie Fay's] rep-

---

8. Under this co-operative advertising arrangement, retailers market Leslie Fay's goods through their private catalogues and national newspaper advertisements.

utation and goodwill and any confusion between his and the senior user's product.' " *Clinique Labs., Inc.*, 945 F.Supp. at 555 (*quoting Lang v. Retirement Living Pub. Co.*, 949 F.2d 576 (2d Cir.1991)). There appears to be no other reason. Nipon and American Pop have a duty to "name and dress" their ties and watches to avoid likelihood of confusion with Leslie Fay's products. *See id. (citing Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 618 F.2d 950, 953 (2d Cir.1980), *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982)). Generally, "[s]election of a mark that reflects the product's characteristics, request for a trademark search and reliance on advice of counsel are" indicia to support a finding of good faith. *See Lang*, 949 F.2d at 583 (*citing E.S. Originals Inc. v. Stride Rite Corp.*, 656 F.Supp. 484 (S.D.N.Y.1987)); *Bear U.S.A., Inc. v. A.J. Sheepskin & Leather Outerwear, Inc.*, 909 F.Supp. 896, 907 (S.D.N.Y.1995). However, I find Nipon's use of the Leslie Fay Trademark was in bad faith.

Nipon argues that the use of his own name, and related advertising, is a permissible means to inform the public and industry of his association with American Pop. He further argues that his several inquiries to the Panitch Firm regarding the use of his name demonstrates his degree of caution and good faith. My reading of the Panitch Firm's letters persuade me otherwise. Nipon argues that he did not take any steps to market his goods until he received advice from counsel. Leslie Fay counters that Nipon only followed the Panitch Firm's opinion, after he pressured it to provide more liberal opinions. Indeed, the first letters from the Panitch Firm indicated that it would be an unreasonable business risk for Nipon to place his name on hang tags and labels. Read as a body, the letters do not support Nipon's position.

 It is clear that Nipon was aware that he was walking a fine line between permissible and impermissible use of a trademark mark. He knew that by using his name he was using the goodwill of the mark belonging to Leslie Fay. Indeed, he went to great lengths by getting opinion letters from the Panitch Firm as to how he may use it. The

mere seeking of advice from counsel does not insulate one from a finding of bad faith. Nipon appears to have read the letters selectively.

### 6. Actual Confusion

 Actual confusion is highly probative, but not necessary for a determination, of a likelihood of confusion. *See Bear U.S.A.*, 909 F.Supp. at 906 ("The plaintiff is not required to prove the fifth *Polaroid* Factor, actual confusion, in order to prevail, although its presence helps."); *Schieffelin & Co. v. Jack Co. of Boca, Inc.*, 850 F.Supp. 232, 245 (S.D.N.Y.1994). It is well established that the Lanham Act does not require evidence of *actual* confusion to find a *likelihood* of confusion. *See, e.g., Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir.1986); *Clinique Labs., Inc. v. Dep Corp.*, 945 F.Supp. 547, 555 (S.D.N.Y.1996). This is true when, as here, the second comer is still introducing the mark into the marketplace and thus opportunities for confusion are limited. *Clinique*, 945 F.Supp. at 555. It stands to reason that a senior user should not have to wait until actual confusion and/or dilution occurs before infringement may be found. It would also be unfair to require a junior user to make a substantial investment in a new mark before a determination is made.

Market research surveys often demonstrate confusion. *See Schieffelin & Co.*, 850 F.Supp. at 245 (*citing Resource Developers, Inc. v. Statue of Liberty–Ellis Island Found., Inc.*, 926 F.2d 134 (2d Cir.1991)). Only Leslie Fay commissioned a survey to evaluate the likelihood of confusion in the marketplace. The survey, "Likelihood of Confusion Study" (the "Survey"), is before me. The Survey concluded that there "is a significant likelihood of confusion that exists such that individuals who encounter a product from American Pop that incorporates the Albert Nipon designation falsely believe such a product to come from the same source as products from Leslie Fay that utilize Albert Nipon designation." *Stipulated Facts*, at Ex. G, ¶ 23. The Survey conservatively estimated that 37% of those surveyed shown confusion between the products.

Nipon attacks the survey's methodology. He argues that the Survey does not focus on relevant consumers in a shopping mall, is biased, asks vague questions, and fails to replicate purchasing market conditions. Nipon's objections are noted, but I am not convinced that the Survey was fatally flawed. The flaws merely go to the survey's weight and do not completely taint its reliability to assess potential consumer confusion. *See, e.g., Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir.1987); *Gucci v. Gucci Shops, Inc.*, 688 F.Supp. 916, 926 (S.D.N.Y.1988) (finding that a "somewhat flawed" survey was reliable and probative of consumer confusion). I find the Survey's ultimate finding of consumer confusion probative.

 A judge's visual inspection, in combination with survey data, is sufficient grounds to establish "actual confusion." *Charles of the Ritz Group Ltd. v. Quality King Distribs., Inc.*, 832 F.2d 1317, 1322 (2d Cir.1987) ("While the focus in determining the likelihood of confusion must be on market conditions instead of in-chambers inspections, the combination of visual inspection and empirical evidence suffices to find 'actual confusion' in this case.") (internal citations omitted). The survey conservatively indicated a high percentage of confusion at 37%. This data, coupled with my own visual observation of the products, labels and hangtags, shows a strong similarity between the products.

According, this factor supports a likelihood of confusion that consumers will believe that the products derive from the same source or that there is a relationship between the mark users.

### 7. Quality of the Product

 The greater the disparity in the quality of the products, the less likely it is that the consumer may confuse a product's source. *See id.* at 1323 (focusing on price differential); *Clinique Labs., Inc. v. Dep Corp.*, 945 F.Supp. 547, 555 (S.D.N.Y.1996) ("a 'lack of marked difference in quality between goods supports the inference that they emanate from the same source.'") (internal citations omitted). Conversely, the more similar the products, the more likely a con-sumer would be confused about a product's origin or a relationship between the trade-marks.

Nipon argues that because Leslie Fay's products are "better priced," and in some cases different products, they are not likely to cause consumer confusion. At their closest point, American Pop and Leslie Fay ties are priced within five dollars. American Pop ties are made of polyester and Leslie Fay ties are made of silk. Although these differences lessen the likelihood of confusion, I find that they are not enough of a distinction in quality to prevent consumer confusion.

 Moreover, if the senior user's product is of higher quality than the junior product, it is protected from being tarnished by an inferior product. *See Hormel*, 73 F.3d at 505; *Clinique*, 945 F.Supp. at 555–56. Here, Leslie Fay's ties are slightly higher priced and of better quality than those sold by American Pop. However, because the difference is only slight, this factor does not substantially lessen the strong likelihood of confusion developed from balancing the other factors.

### 8. Customer Sophistication

 In general, "the more sophisticated and careful the average consumer of a product is, the less likely it is that similarities in trade dress or trade marks will result in confusion concerning the source or sponsorship of the communications." *Bristol–Myers Squibb Co. v. McNeil–P.P.C. Inc.*, 973 F.2d 1033, 1046 (2d Cir.1992) (*citing Centaur Communications, Ltd. v. A/S/M Communications*, 830 F.2d 1217, 1228 (2d Cir.1987)); *See Charles of the Ritz*, 832 F.2d at 1323; *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir.1986). In addition, "[t]he degree of reliance by consumers on labels and trademarks will also vary from product to product." *McGregor–Doniger, Inc. v.. Drizzle, Inc.*, 599 F.2d 1126, 1137 (2d Cir.1979) (*citing Modular Cinemas of America Inc. v. Mini Cinemas Corp.*, 348 F.Supp. 578, 583 (S.D.N.Y.1972)). However, it is also true that "[i]n some cases, of course, as where the products are identical and the marks are identical, the sophistication of buy-

ers cannot be relied on to prevent confusion." *Id. (citing Omega Importing Corp. v. Petri–Kine Camera Co.,* 451 F.2d 1190, 1195 (2d Cir.1971)).

In this case, I have already found that the marks are quite similar. It is unnecessary to examine whether or not the consumers of apparel and men's neckwear are sophisticated. Here, the marks that appear on Leslie Fay's ties and American Pop's ties are so similar, even a sophisticated consumer group would be confused. The purchase of wearing apparel is not a complex transaction that requires a high degree of care. Nipon claims that because the goods are "designer" the customer is sophisticated. However, Nipon's products are sold in the mass market and are less expensive, which is usually indicative of less customer sophistication in relation to the purchase. *See Charles of the Ritz,* 832 F.2d at 1323. Where the junior products are designer, but sold through mass markets at a relatively low price point ($9 – $20 for a tie), an argument that the consumers are very sophisticated is unconvincing. Assuming, *arguendo,* the purchasers are sophisticated, many courts have found that purchasers of designer goods are often more vulnerable to confusion by similar marks because of their strong awareness of the status of the brand name. *See Lois Sportswear,* 799 F.2d at 875; *Clinique,* 945 F.Supp. at 556 (*citing Krueger Int'l v. Nightingale, Inc.,* 915 F.Supp. 595, 611 (S.D.N.Y.1996)). A consumer who is aware of the designer Nipon Trademarks could easily be misled by the neckwear label or watch packaging that boldly use the full distinct name—Albert Nipon. "It is the 'subliminal confusion' apparent in the ... relationship ... between the ... entities and the products that can transcend the competence of even the most sophisticated consumer." *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf., v. Steinway & Sons,* 523 F.2d 1331, 1341 (2d Cir.1975).

Therefore, even though the goods are "designer," the consumer purchaser is not necessarily an especially sophisticated one and, thus, the likelihood of confusion is not mitigated by this factor. After reviewing the various factors, I find that there is a strong likelihood of confusion among consumers.

**B. Trademark Dilution of a Famous Mark Under 15 U.S.C. § 1125(c)**

Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c) forbids "dilution" of famous marks and provides for relief in the form of an injunction against "commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark." 15 U.S.C. § 1125(c) (West 1998). Under the Lanham Act, the requirements to prove dilution under section 43(c) are less stringent than section 43(a). *See Clinique Labs., Inc. v. Dep Corp.,* 945 F.Supp. 547, 561 (S.D.N.Y.1996). Under section 43(c), Leslie Fay must demonstrate: "(1) ownership of a distinctive trade dress or famous mark, and (2) dilution." *Id.* (*citing* 15 U.S.C. § 1125(c)). 15 U.S.C. § 1127 defines "dilution" as the "lessening of the capacity of a famous mark to identify and distinguish goods or services." The dilution analysis tests the possibility that the mark will loose its ability to serve as a unique identifier of Leslie Fay's products. *Deere & Co. v. MTD Prods., Inc.,* 41 F.3d 39, 43 (2d Cir.1994). A dilution analysis considers damage to the senior user and not confusion of the ordinarily prudent purchaser as the likelihood of confusion analysis does. *See Hormel Foods Corp. v. Jim Henson Productions, Inc.,* 73 F.3d 497, 506 (2d Cir.1996). The harm addressed is whether there will be a weakening in the distinctive selling power of the mark. *See Deere,* 41 F.3d at 45.

The standard to analyze dilution under section 43(c) is not clear. *Id.* The Southern District of New York follows the "traditional New York dilution analysis...." *Id.* Under the New York analysis, dilution is found upon a showing of either blurring or tarnishment. *Id.* (*citing Hormel,* 73 F.3d at 506; *Deere,* 41 F.3d at 42).

*1. Ownership of a Famous Mark*

To determine whether a mark is distinctive and famous, a court may consider the following non-exclusive factors:

(A) the degree of inherent or acquired distinctiveness of the mark; (B) the duration and extent of the use of the mark in connections with the goods or services with which the mark is used; (C) the duration and extent of advertising and publicity of the mark; (D) the geographical extent of the trading area in which the mark is used; (E) the channels of trade for the goods or services with which the mark is used; (F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought; (G) the nature and extent of use of the same or similar marks by third parties; and (H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905 or on the principal register.

15 U.S.C. § 1125(c)(1). In analyzing the likelihood of confusion under section 43(a) of the Lanham Act, in section A, above, I found, that the Nipon trademarks are strong. This analysis and finding satisfies the famous mark test. *Clinique,* 945 F.Supp. at 561. Indeed, that the Albert Nipon name is famous cannot be gainsaid.

### 2. Dilution

### a. Tarnishment

 "Tarnishment may occur when the plaintiff's mark is used by the defendant in association with unwholesome or shoddy goods or services." *Id.* at 562 (*citing Hormel,* 73 F.3d at 507; *Deere,* 41 F.3d at 43). The requisite to any finding of tarnishment is that Leslie Fay's "mark will suffer negative associations through [Nipon's and American Pop's] use." *Id.* Nipon himself admits, though in the most diplomatic of terms, that his goods do not meet the quality standards Leslie Fay uses for its Nipon lines.

### b. Blurring

 The five relevant factors typically used to assess dilution by blurring under Section 43(c) of the Lanham Act are: (1) the similarity of the trademarks; (2) the similarity of the products; (3) the sophistication of the purchasers; (4) renown of the senior mark; (5) renown of the junior mark. *See id.*

 In analyzing the likelihood of confusion under section 43(a) of the Lanham Act, I found, that American Pop's and the Nipon Trademarks and products are similar and the Nipon Trademarks are renowned. The balance of these factors weigh heavily in favor of finding dilution of the Nipon Trademarks. Although I found Nipon used his mark in bad faith, his actions do not necessarily rise to the level of predatory intent. Indeed, although I do not address whether Nipon's actions constituted predatory intent, the balance of the factors demonstrate a likelihood of dilution.[9]

### C. Violations of New York General Business law § 368–d

 New York law provides that injunctive relief may be gained, without showing confusion as to source, where a defendant's conduct poses

> [l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

N.YGen.Bus.Law § 368–d (McKinney 1997). Under the New York statute, in addition to the five factors in the federal dilution analysis, predatory intent is considered. *Deere & Co. v. MTD Products, Inc.,* 41 F.3d 39, 46 (2d Cir.1994).[10] Under New York law, in order

---

**9.** Because the American Pop mark is new to the market and Nipon acknowledges that he has not heavily promoted the products because of these trademark issues, any analysis of its renown introduces excessive speculation as to its potential to succeed and possibly affect to Leslie Fay's marks. Therefore, the renown of a junior mark

is not included in the blurring analysis. *See Clinique,* 945 F.Supp. at 563.

**10.** The New York courts have not agreed upon the use or meaning of predatory intent in the context of an anti-dilution claim. *See Deere,* 41 F.3d at 45–46. Although some courts say that it is an element of the New York test, *Horn's, Inc.*

to prevail on a dilution claim, Leslie Fay must demonstrate (1) "a trademark or name which is 'truly of distinctive quality' or one which has 'acquired a secondary meaning in the mind of the public.'" *McDonald's Corp. v. McBagel's, Inc.*, 649 F.Supp. 1268, 1280 (S.D.N.Y.1986) (*quoting Miss Universe v. Patricelli*, 753 F.2d 235, 238 (2d Cir.1985)); (2) a "plaintiff must show that the similarity between its mark and the defendant's slogan or mark results in 'whittling down' of the identity or reputation of a trademark or mark." *Id.* (*citing Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 625 (2d Cir.1983)); (3) whether or not Nipon acted with "predatory intent." *Id.*

 The federal and New York state dilution statutes differ only by New York's predatory intent factor. This factor is relevant, but not dispositive. *Id.* Because I found that Nipon and American Pop violated the federal dilution statute, so too have they violated the New York statute. I need not find predatory intent to find a violation of the New York statute *Id.*[11] Accordingly, I find that Nipon and American Pop violated New York's dilution statute.

### D. Common Law of Unfair Competition

 The requisites for a finding of unfair competition under the common law closely parallel an action under the Lanham Act. *Id.* at 1279–80. The key element in an analysis of common law unfair competition is "a showing that the defendant's conduct will result in consumers confusing the source of defendant's products". *Id.* at 1280 (*citing Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 618 F.2d 950, 953 (2d Cir.1980); *Flexitized, Inc. v. National Flexitized Corp.*, 335 F.2d 774, 781–82 (2d Cir.1964), *cert. denied*, 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965)). I found that there was a substantial likelihood of confusion between the products marketed by American Pop and Leslie Fay under section 43(a) of the Lanham Act. I also found, among other things, that the

*v. Sanofi Beaute, Inc.*, 963 F.Supp. 318, 327 (S.D.N.Y.1997), others state that the absence of it is relevant because it lessens the likelihood of dilution. *See, e.g., Deere*, 41 F.3d at 42; *Simon & Schuster, Inc. v. Dove Audio, Inc.*, 970 F.Supp. 279, 302–03 (S.D.N.Y.1997).

marks were similar, they are advertised in close proximity, and there was actual confusion between the products. A finding of confusion under the Lanham Act satisfies the common law criteria of confusion. *Id.* Accordingly, Nipon and American Pop's acts constituted common law unfair competition.

### E. Declaratory Judgment

Plaintiffs seek a declaratory judgment to determine that "Nipon may use his name and/or signature as aforementioned and that such usage may, *inter alia*, be on hang tags, labels, etc. and that such usage is not violative of the Trademarks which were sold to Leslie Fay pursuant to the Agreement." *Compl.* ¶ 45. Plaintiffs also seek a declaration that "Nipon is not in violation of the corporate transfer contained in the Agreement insofar as the exclusive right to use the Nipon name was never conveyed therein." *Id.* Under these facts, I decline to issue a declaratory judgment for lack of an actual case or controversy.

 The Declaratory Judgment Act provides:

In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201 (West 1997). A bankruptcy court, under 28 U.S.C. § 2201, may grant a declaratory judgment, whenever a real threat of litigation exists. *See In re Chateaugay Corp.*, 201 B.R. 48 (Bankr.S.D.N.Y.1996), *aff'd in part*, 213 B.R. 633 (S.D.N.Y.1997); *see also In re Downingtown Industrial & Agricultural School (Downingtown Industrial & Agricultural School v. Commonwealth)*, 172 B.R. 813 (Bankr.E.D.Pa.1994). The

**11.** Indeed, the preponderance of factors under the Lanham Act may well justify such a finding.

"[Declaratory Judgment] Act may be utilized whenever a litigant has a justiciable issue, and the remedy sought from the court does not involve the issuance of an advisory opinion in connection with a hypothetical set of facts, but rather, a declaration in relation to an actual or live controversy which will be useful in resolving the dispute." 12 *Moore's Federal Practice*, § 57.02[3] at 57–10 (Matthew Bender 3d ed.1997).

 A federal court's jurisdiction is limited to actual cases and controversies. *See* U.S. Const. art III, § 2. The standard to determine whether a declaratory judgment action presents an actual controversy is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). "Where the contingent event upon which the controversy rests is unlikely to occur, the controversy is not of 'sufficient immediacy and reality' and a declaratory judgment may not be issued." *Ingersoll–Rand Co. v. Textron, Inc.*, No. 96 Civ. 2582, 1996 WL 680266 (S.D.N.Y. Nov. 25, 1996) (*citing Certain Underwriters at Lloyd's, London v. St. Joe Minerals Corp.*, 90 F.3d 671, 675 (2d Cir. 1996)). A determination whether declaratory judgment is appropriate is done on a case by case analysis and "the issue is often one of degree." *In re The Leslie Fay Cos., Inc.* (*Nipon v. The Leslie Fay Cos.*), No. 93B41724, at 10 (Bankr.S.D.N.Y. Sept. 21, 1995) (*citing Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937)). In *Aetna Life Ins. Co. v. Haworth*, the Supreme Court described a "controversy," for the purposes of the Declaratory Judgment Act, as:

one that is appropriate for judicial determination. A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic and moot. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. Where there is such a concrete case admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding upon the facts alleged, the judicial function may be appropriately exercised although the adjudication of the rights of the litigants may not require the award of process or the payment of damages. And as it is not essential to the exercise of the judicial power that an injunction be sought, allegations that irreparable injury is threatened are not required.

*Aetna Life Ins. Co.*, 300 U.S. at 240–41, 57 S.Ct. at 464 (citations omitted).

 In an action for declaratory judgment over use of trademarks, the Second Circuit has adopted a two-pronged test to determine whether an actual case or controversy exists. *See Starter Corp. v. Converse, Inc.*, 84 F.3d 592 (2d Cir.1996). First, the declaratory plaintiff must have a real and reasonable apprehension of litigation. *See id.* at 595. Second, declaratory plaintiff must have engaged in a course of conduct that brought it into adversarial conflict with the declaratory defendant. *Id.* (*citing Windsurfing Intern., Inc. v. AMF Inc.*, 828 F.2d 755 (Fed.Cir.1987)). If both prongs are satisfied, an actual case or controversy exists and a declaratory judgment may be issued. *Id.*

The Supreme Court has made clear that "[a] justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic and moot." *Aetna Life Ins. Co.*, 300 U.S. at 240, 57 S.Ct. at 464. Because I find Nipon's and American Pop's conduct violative of the Lanham Act, their request for a declaratory judgement is moot.

## IV. Decision

 For the reasons set forth above, I find Nipon and American Pop in violation of Sections 32, 43(a) and 43(c) of the Lanham Act, as well as New York General Business Law § 368–d and of unfair competition under

the common law. Nipon's and American Pop's request for declaratory judgment is denied as moot. Nipon is enjoined from using his name on any merchandise labels for American Pop.

There is a distinction between the use of Nipon's name with consumers and his informing the apparel industry that he is working for a company other than the Leslie Fay Companies. In the latter case, he is unlikely either to confuse or dilute the Albert Nipon Trademarks. Nipon, by selling his name as a trademark, is not precluded from ever again working in the apparel industry. Accordingly, Nipon is not precluded from advising the apparel industry of his association with American Pop.

Settle Judgment.